UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:07-CR-082 RLM |
| | ) | |
| DENNIS JAMES WOODEN | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

**I.      Procedural Background**

On August 8, 2007, the Defendant, Dennis James Wooden (Wooden) was indicted for possessing a firearm, a Colt .22 caliber handgun, from which the manufacturer's serial number had been removed, and for being a felon in possession of a handgun.

On September 28, 2007, he filed a motion to suppress the gun seized at the time of his arrest. On October 1, 2007, the United States filed its response to his motion. On October 4, 2007, this motion was referred to the undersigned to conduct any and all proceedings necessary to issue a report and recommendation concerning the appropriate disposition of Wooden's motion. On October 25, 2007, an evidentiary hearing and oral argument was held on Wooden's motion to suppress.

Wooden argues that the investigative stop by police officers and his subsequent arrest was constitutionally deficient. Specifically, he argues that the anonymous tip that triggered police involvement was insufficiently reliable, and therefore, the police lacked the reasonable suspicion that the Fourth Amendment requires to make a lawful stop.

For the reasons stated below, the undersigned **RECOMMENDS** that Wooden's motion to suppress be **DENIED**.

II.     Facts

Although a four hour evidentiary hearing was held in which two witnesses for the United States and three witnesses for Wooden testified, there is little disagreement on the material facts.

On Saturday, January 27, 2007, at approximately 8:10 a.m., South Bend police received a 911 call. The 911 call was traced to a telephone booth at Instant Lube, located at 1512 South Miami Street in South Bend. The anonymous caller reported that he just had observed an argument between an armed man and his female companion, that the man had pulled a handgun from a holster on his waist, and that the pair subsequently walked into a 7-Eleven store.[1]

---

[1] The following is Exhibit 2 from the evidentiary hearing and is a transcript of the 911 call, which was recorded:

> Operator: 911.
> Caller: Yes I would like to report a black male with a silver hand gun, he was arguing with his, ah, girlfriend, or whatever.
> Operator: Where at?
> Caller: They were walking toward 7-Eleven on Miami, he's tall, he's wearing a black jacket and blue jean pants, he has the gun on a holster. And I seen him pull it out.
> Operator: Ok, which way are they walking on Miami, north or south?
> Caller: They walking toward on the . . . the . . . right side, going toward, they're going toward 7-Eleven.
> Operator: From where, the mall, the mall area, or what?
> Caller: No, they're, they were walking down Miami Street.
> Operator: Alright, did they come from Lincolnway or did they come from Ireland Road?
> Caller: They came from Lincolnway East.
> Operator: Ok, so . . .
> Caller: He's very tall and he has like a black, uh, hat on.
> Operator: Male, black you said?

2

The 7-Eleven described by the anonymous caller is located at 1827 South Miami Street in South Bend. The 7-Eleven is approximately two blocks south of the Instant Lube.

Corporal Gary Reynolds and Sergeant Kevin Gibbons, experienced police officers of the South Bend Police Department, were immediately dispatched to the scene at approximately 8:10 a.m.  They received the following radio dispatch, which was recorded: "1827 South Miami, male black wearing a black jacket with blue jeans was in a ten-ten with a female white, with long and brown hair.  He pulled a silver handgun out on her and went inside a 7-11. 1827 South Miami." (Exhibit 3)  Officers received a similar dispatch on their in-car computers: "MB WEARING BLK JACKET W/ BLUE JEANS FIGHTING WITH FW LONG STRINGY BROWN HAIR. PULLED SILVER HANDGUN OUT ON HER A COUPLE OF TIMES. NOW WALKED INTO 711."

(Exhibit 7)

---

Caller: Yeah, I can, I can see him from here, they're walking.....
Operator: What's he wearing?
Caller: Uh, black jacket, with blue jean pants.
Operator: And the female, white or black?
Caller: White, with long, uh, stringy brown hair.
Operator: Long hair, you said?
Caller: Yes, long hair, yes.
Operator: And what road are they at right now?
Caller: They are going to 7-Eleven, I can see them.
Operator: Right, what road did they just cross?
Caller: Uh, Milton.
Operator: Milton?
Caller: Yeah, but I can see them going to 7-Eleven.
Operator: Ok, we'll get somebody out that way, they're going to 7-Eleven?
Caller: Yeah, yes they just went into 7-Eleven, sir.
Operator: Okay, we'll be on our way. Goodbye.

As Cpl. Reynolds approached the 7-Eleven, he first passed the phone booth from which the 911 call had been placed, and he did not observe anyone there. He arrived at the 7-Eleven at approximately 8:13 a.m. and observed a couple matching the description of the individuals identified on the dispatch walking away from the 7-Eleven, within one-half block of the 7-Eleven. Cpl. Reynolds observed the couple from behind for approximately 20 to 30 seconds or one-half block, after which he got out of his car and, at gunpoint, ordered the individuals to stop. While observing the couple before the stop, Cpl. Reynolds did not notice anything unusual or suspicious which, absent the dispatch, would warrant a stop. The individuals were stopped approximately one block from the 7-Eleven. Cpl. Reynolds ordered the individuals to put their hands in the air, and the pair complied. At this point, Sgt. Gibbons arrived in his police car.[2] As Sgt. Gibbons approached the male (Wooden), he asked him if he was armed. Wooden said, "Yes." Sgt. Gibbons asked Wooden where the gun was, and Wooden told him. Gibbons then recovered a loaded silver handgun with an obliterated serial number in a black holster from the left side of Wooden's waist. Wooden stated that he did not have a permit for the gun, and he was then handcuffed. After being advised of his *Miranda* rights, Wooden also admitted that he had prior felony convictions in Michigan.

### III.     Analysis

In Terry v. Ohio, 392 U.S. 1 at 20, (1965) the Supreme Court held that Police may conduct a limited, warrantless intrusion into a person's rights under the Fourth Amendment based on reasonable, articulable suspicion rather than probable cause. Wooden, however, argues

---

[2] Sgt. Gibbons activated the video camera of his patrol car and the arrest, with sound, was recorded. The audio and video recording was admitted as Exhibit 11.

that the anonymous tip involved in this case is insufficient and unreliable and cites the more recent Supreme Court case, Florida v. J.L., 529 U.S. 266 (2000), to support his argument.

      A.      The Anonymous Tip

In J.L. an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. Officers went to the bus stop and saw three (3) black males, one of whom was wearing a plaid shirt. One of the officers frisked J.L. and seized a gun from his pocket. Apart from the tip, officers had no reason to suspect any of the three (3) of illegal conduct. Prior to the stop and frisk, the officers did not see a firearm or observe unusual movements.

      1.      The Rule

A unanimous Supreme Court held that an anonymous tip that a person is carrying a gun, without more, is not sufficient to justify a police officer's stop and frisk of that person. The Court noted that the officers' suspicion that J.L. was carrying a weapon arose not from their own observations but solely from a call from an unknown location by an unnamed caller. The tip lacked sufficient indicia of reliability to provide reasonable suspicion to make a Terry stop. J.L. at 1380.

In reaching this decision, the Supreme Court contrasted its earlier ruling in Alabama v. White, 496 U.S. 325 (1990). In White, the court held that an anonymous tip could constitute reasonable suspicion to justify a Terry stop if the anonymous tip was sufficiently corroborated to demonstrate its reliability. In White, the tip described future events, which the police were then able to observe. This corroboration established the credibility of the anonymous tip. In contrast, the Supreme Court found the anonymous tip in J.L. to be insufficient because it lacked predictive

5

information of future events that left the police without the means or ability to test the informant's knowledge or credibility.

Wooden argues that the facts of his stop are identical to those in J.L. and must be suppressed. He argues that like J.L., the anonymous tip here does not contain any predictive information which the police could observe as they did in White. Like J.L., the tip merely described what the informant had observed. And like J.L., other than the tip, the police did not observe any conduct that would suggest any illegal or suspicious conduct to justify the stop. Wooden concludes that like J.L., the anonymous tip lacked reliability and did not provide the police with the reasonable suspicion that is needed to make a lawful investigative stop.

This court disagrees. While the comparisons of the facts of this case to those in J.L. are similar, there are critical distinctions that compel a different result.

### 2. The Exception to the Rule

While the Supreme Court in J.L. found the anonymous tip to be insufficiently reliable to justify the investigative stop, the Court did not rule that all anonymous tips are *per se* unreliable. Rather, the Court noted circumstances where anonymous tips of undetermined reliability may be sufficient to justify an investigative stop. The Court noted that in circumstances where there is a diminished expectation of privacy, such as at airports or at schools, or when the tip describes a particularly dangerous situation, such as a bomb, the requirement of reliability of the tip might be lessened. Thus, while the Court found that an anonymous tip of undetermined reliability alleging the possession of a gun was insufficient, it also acknowledged that certain circumstances could justify the police to make an investigative stop without corroborating the tip. J.L. at 1380.

6

This court concludes the facts of this case present the very circumstances alluded to in J.L. that create the exception to the rule of J.L. Those facts that distinguish this case from J.L. are the following: in J.L., the tip reported that an individual merely had a gun, which is passive possession. In this case, the tip reported a much more dangerous situation. The caller told police that Wooden not only had a gun, but that he had pointed it at the woman while they argued. As the transcript of the 911 reveals, the caller told police "... a black male with a silver hand gun, he was arguing with his, ah, girlfriend, or whatever... he has the gun on a holster. And I seen him pull it out." (Exhibit 2). Thus, unlike the caller in J.L., the caller here was reporting a serious and dangerous crime. The dangerousness described in the call is the very type of circumstance contemplated by the Supreme Court in J.L. The imminent nature of the life threatening danger compelled the police to act immediately and allowed little opportunity for independent corroboration of the reliability of the tip.

This life threatening crisis is the type of danger that the Supreme Court in J.L. foreshadowed that could justify a lesser standard of reliability when using an anonymous tip. This threat alone justifies the police investigative stop. The Seventh Circuit refers to a "presumption of reliability" of an eye witness 911 call. In U.S. v. Drake, 456 F.3d 771 (7th Cir. 2006), a case including a 911 call to police reporting criminal conduct, the Seventh Circuit wrote:

> *We therefore presume the reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion*, particularly when the caller identifies herself. It is enough in this case that [the caller's] 911 call reported an immediate threat to public safety and that she provided sufficient details to allow the officers to identify the suspects. The police, when they located the Cadillac [the caller] described, were not confronted with any reason to doubt her report, and thus the presumption remained intact. Requiring further indicia of reliability would only

    jeopardize the usefulness of the 911 system and the ability of officers
    to prevent further danger to the public.
*Id.* at 775 (emphasis added).

  Other courts have reached similar results.  See Anthony v. City of New York, 339 F.3d 129, 136, (2d Cir. 2003);  United States v. Terry-Crespo, 356 F.3d 1170, 1176 (9th Cir. 2004); United States v. Holloway, 290 F.3d 1331, 1338 (11th Cir. 2002); see also United States v. Hicks, 2006 WL 3210457, at *4 (N.D. Ind. 2006); United States v. Kyle, 2006 WL 3391354, at *2 (N.D. Ind. 2006).

    3.  Corroboration of the Anonymous Tip

  Even though more was not needed, the police were nonetheless able to corroborate some facts prior to the stop, further justifying their stop of Wooden.  Cpl. Reynolds was able to learn that there was a phone outside of the Instant Lube from which the 911 call originated, and that from this location, it would have been possible to observe a couple walking south on Miami towards the 7-Eleven.

  Wooden argues the caller's tip was unreliable because the police could have determined that some of the caller's reported facts, such as his ability to see two people go into the 7-Eleven from his vantage point, were either untrue or unlikely.  But the failure of the police to corroborate all of the facts reported is of no significance.  The urgency of the 911 call and the danger reported did not require any corroboration at all to satisfy the requirements of J.L.  As Drake explains, there is a presumption of reliability to an eye witness 911 call reporting an emergency.  The fact that the police were able to corroborate some of the facts only makes this case closer to the exception described in J.L.

  B.  The Totality of Circumstances

8

As discussed earlier, Wooden attempts to make much of the fact that the officers did not corroborate more of the tip. He argues that if they had examined the line of sight from the location of the call to the 7-Eleven store, it might have shown that the caller could not see all that was reported, and this would then have undermined the reliability of the anonymous tip. However, Wooden places too much emphasis on these facts.

When determining reasonable suspicion, the court must consider the totality of the circumstances and not focus on particular factors in isolation. The Supreme Court in United States v. Arvizu, 534 U.S. 266, 274 (2002) noted, "Terry precludes this sort of divide-and-conquer analysis." See also United States v. Zambrana, 428 F.3d 670 (7th Cir. 2005). The Seventh Circuit advises that the court should evaluate the officers' conduct not from the point of view of scholars in a library, but from the point of view of those "versed in the field of law enforcement." United States v. Sholola, 124 F.3d 803, 812 (7th Cir. 1997), quoting United States v. Cortez, 449 U.S. 411, at 418 (1981).

In this case, very experienced police officers [3] responded to a radio and computer dispatch advising them of a 911 call which had reported a black male, with a gun, arguing with a white female on Miami Street. The dispatch indicated that the man with the gun had "...pulled silver handgun out on her a couple of times." Both officers testified that they knew the Miami Street area near the site of the 911 call and the 7-Eleven store to be a high crime area and were on heightened alert when they heard the dispatch report concerning an argument and a gun. Additionally, as previously discussed, Cpl. Reynolds corroborated parts of the anonymous call, including its location.

---

[3]"Coporal Reynolds has more than 30 years experience as a police officer and Sergeant Gibbons more than 23."

Thus, the totality of circumstances mosaic of this case consists of a dispatch informing police officers of a black male with a gun arguing with a white woman in a high crime area, which 911 call was partially corroborated by Corp. Reynolds and finally, a couple generally matching the reported couple observed in the vicinity of the call.  These facts, coupled with the police officers' experience, create the reasonable suspicion required by Terry, and allow the police to stop Wooden.  The fact that the police officers might have been able to corroborate more or less of the tip is of no consequence.  What they did was sufficient and the law requires no more.

## IV. Conclusion

Because the anonymous 911 call reported a dangerous life threatening emergency, this case is distinguishable from J.L.  The presumption of reliability expressed in Drake was further strengthened when police were able to corroborate some of the anonymous callers facts.  And finally, the totality of circumstances established reasonable suspicion allowing the police officers to stop Wooden.  His stop, frisk, and arrest were well within constitutional standards, and they do not, therefore, warrant the suppression of items seized or statements made.  As a result, it is **RECOMMENDED** that Wooden's Motion to Suppress be **DENIED.**

> **NOTICE IS HEREBY GIVEN that within ten (10) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations.  Fed.R.Civ.P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**
>
> **SO ORDERED.**

Dated this 31st day of October, 2007.

                S/Christopher A. Nuechterlein
                Christopher A. Nuechterlein
                United States Magistrate Judge